44 C.C.P.A. (Patents).

**Matter of the Application of Joseph H. HORNSTEIN.**

**Patent Appeals No. 6284.**

United States Court of Customs and Patent Appeals.

June 4, 1957.

Elmer L. Zwickel, Chicago, Ill., for appellant.

Clarence W. Moore, Washington, D. C. (S. Wm. Cochran, Washington, D. C., of counsel), for the Commissioner of Patents.

Before JOHNSON, Chief Judge, and O'CONNELL, RICH, and JACKSON (retired), Judges.

JACKSON, Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the Primary Examiner's final rejection of claims 8–11 of appellant's application for a patent on a contact lens.

Claim 8 is representative of the appealed claims and reads as follows:

"8. A corneal contact lens of concavo-convex form in section and of a size to lie within the area defined by the limbus having an inner central spherical area corresponding in its perimeter to the perimeter of the apical area of the cornea to which the lens is applied and formed on a smaller radius than the radius of said apical area so that a crescent-shaped space is present between said central spherical area and the surface of said apical area, and the remainder of the inner surface of said lens extending radially outwardly toward the limbus being formed on a greater radius than said central area and corresponding in curvature with the corneal peripheral area."

The references relied on are:

Butterfield 2,544,246 Mar. 6, 1951

"Corneal Contact Lenses"—Article by Bier, in "The Optician", September 9, 1949, published in London, England, page 185.

"The Corneal Lens"—Article by Dickinson, in "The Optician", September 2, 1949, published in London, England, pages 141–144.

"The Corneal Lens"—Article by Jones in "The Optician", October 6, 1950, published in London, England, pages 287–293.

Corneal Lenses—Another Viewpoint"—Article by Bier in "The Optician", November 10, 1950, published in London, England, pages 435 and 436.

The structure of the lens described in the specification is based upon the physical shape of the human eye which, briefly, comprises a sclera (the white of the eye) and a central cornea (the transparent outer coat of the eyeball covering the colored portion of the eye) meeting at what is termed the limbal zone. Viewed from in front, the cornea is elliptical in shape, being approximately 12 millimeters in width and 11 millimeters in height. The anterior surface of the cornea is not uniformly curved. It is truly spherical only in its central area, the optical zone. From the perimeter of this central area outward to the limbal zone the marginal surface of the cornea gradually flattens.

The claimed lens is adequately described in appellant's brief as follows:

"The subject matter of the claims relates to a corneal contact lens. The lens, which is shown in the drawing appended hereto has a diameter corresponding substantially to the perimeter of the cornea. The lens has a rounded or bevelled peripheral edge and the inside curvature of the lens, apart from and in addition to the peripheral bevel, is formed on two essentially different radii so as to define: (1) A *wide* peripheral marginal area that conforms substantially to the surface contour of the peripheral area of the cornea over which it lies and (2) A central or apical area which has a radius of curvature that is considerably shorter (deep-

er) than the radius of curvature of the optical zone or corneal apex over which it lies. The steep central area provides a clearly defined space between the inside surface of the apical area of the lens and the underlying corneal apex over which it lies. This space is *crescent-shaped* in section. This structure and its relationship to the eye provides a lens that can be worn without resulting physical contact between the corneal apex and the lens or between the peripheral margin of the lens and the underlying corneal portion. The wide peripheral margin floats on a thin layer of tears that is maintained between it and the cornea and there is just a sufficient amount of capillary attraction to retain the lens in position."

The operation of the lens disclosed in the Butterfield patent is based on the fact that the average human cornea is not exactly spherical, but actually is more like a paraboloid, with the central portion being a sphere to all intents and purposes, but with the radius of curvature becoming greater as one leaves the central area and progresses outwardly toward the limbus. The patentee makes the curvature of the inner surface of the lens *correspond* to the curvature of the corneal portion throughout its extent. The inner surface of the lens has a truly spherical portion in the center of the lens, the radius of curvature of which corresponds to the radius of curvature of the apical zone of the cornea. The curvature of the lens has progressively greater radii from said central portion to the periphery corresponding to the radii of the remainder of the cornea.

The Dickinson article advocates a practice whereby the lens is made "to match fairly closely the corneal curve, and then to have the lens made just sufficiently *large* to be lifted away from the corneal apex by the tapering curve of the limbal area." (Emphasis added.)

The board overruled the examiner's rejection on any one of the references alone but held that each of the claims, which differ from each other only as to details which do not affect their patentability over the prior art, was unpatentable over the Butterfield patent in view of the disclosure of the Dickinson article. The two Bier articles, which referred to the Dickinson article, and the Jones article were held to be only cumulative to the Dickinson article, and the discussion was there limited to the latter reference.

Appellant contends that the board has read too much into the Dickinson reference. With this contention, we are constrained to agree. We think the board has fundamentally misconceived the teachings of the Dickinson article, its improper approach being readily detectable in the following remarks made in its decision. The board stated:

"The Dickinson article discloses a corneal lens of a curvature *steeper or of smaller radius than the apical zone of the cornea* so as to leave a space between the apical zone of the cornea and the inner surface of the lens." (Emphasis added.)

Later, it further remarked:

"Thus the Dickinson article appears to advocate a fitting of the lens such that the curvature of the inner surface of the *central* portion of the lens is made steeper than the curvature of the corresponding zone of the cornea thereby providing a space, *which inherently would be crescent-shaped,* between them." (Emphasis added.)

We discern no such disclosure in the Dickinson reference.

The lens there disclosed has an essentially unicurved posterior surface. The lens is made of larger diameter than the cornea so that its narrow bevelled peripheral edge can rest on the limbal zone and thus "lift" the lens away from the cornea. There is no teaching that the inside surface of the lens should

be made steeper than the corresponding zone of the cornea, thereby providing a crescent-shaped space. On the contrary, it is stated that "it may give capillary clearance when its curve is *shallower* than that indicated by the opthalmometer readings."[1] (Emphasis added.) Clearly, there is no intimation that the radius of curvature of the inner surface of the central portion of the Dickinson lens is smaller than the radius of curvature of the corresponding apical zone of the cornea. There can be no crescent-shaped space in that zone. The space would actually be shallower at the apex of that zone than it is at its perimeter.

In view of the foregoing, it is not seen how the Dickinson article can be relied upon as suggesting modification of the Butterfield lens. Butterfield made his lens conform with the curvature of the entire cornea. Dickinson describes a lens that has contact in the *limbal* area and which is large enough and arched deeply enough to provide clearance over the entire cornea. Butterfield and Dickinson were employing radically different concepts and neither singly nor in combination do they suggest doing what applicant has done. Applicant is, apparently, the first to provide a deeply arched central zone in the lens so that a crescent-shaped space is formed between the lens and the underlying apical zone of the cornea. This device eliminates any possibility of apical contact, provides strong, but not excessive, capillary attraction, and also retains a tear body to insure quick replenishing of the tear layer in the peripheral area should a tear layer be momentarily squeezed out by lid pressure. The practical advantages of such a construction are apparent, and, as evidenced by the affidavit and letters of record, are fully appreciated and recognized by practitioners in the field.

In In re Hummer, 241 F.2d 742, 744, 44 C.C.P.A., Patents, 814, we stated:

"Progress is as important * * * in crowded arts as well as those which are in the pioneer stage * * * and such progress is usually made in small increments."

The art here is admittedly crowded and the improvement made is a narrow one. Improvement alone, however crowded the art may be, of course, does not entitle one to a patent. Appellant, however, has disclosed and claimed a meritorious improvement which is not anticipated nor fairly suggested by the prior art. In our view, it should be afforded the protection of the patent statute.

For the foregoing reasons, the decision of the Board of Appeals is reversed.

Reversed.

WORLEY, J., because of illness, was not present at the argument of this case and did not participate in the decision.

JACKSON, J., retired, recalled to participate herein in place of COLE, J., absent because of illness.

---

1. An opthalmometer is defined as an instrument for measuring the curvature of the cornea.